## HUTCHESON, administrator, *v.* MEHAFFEY *et al.*

The evidence was insufficient to support the verdict, and it was erroneous to overrule the motion for a new trial.

No. 5109. SEPTEMBER 13, 1926.

Equitable petition. Before Judge Irwin. Douglas superior court. September 18, 1925.

J. F. Mehaffey instituted an action against J. R. Hutcheson as administrator of the estate of O. L. Landmon, for specific performance of a parol contract alleged to have been made by O. L. Landmon, whereby in consideration of specified services Landmon would execute a will devising and bequeathing all of his property to the petitioner. The contract and acts of performance thereof by the petitioner were alleged as follows: "The said O. L. Landmon . . voluntarily contracted and agreed with petitioner, that, if he would continue to look after him and care· for him, do his washing and mending and cooking, give to him due care and attention throughout the remainder of his life, and see to it that he was decently buried and his grave properly marked, he, the said O. L. Landmon, deceased, would make a will bequeathing to petitioner the whole of his estate, both real and personal. Petitioner shows that he accepted this proposal, left his home and his crop in the hands of his brothers and sister, continued to abide at the home and on the permises of the said O. L. Landmon, deceased, and for eight long years he cooked the meals of the said O. L. Landmon, deceased, washed and mended his clothes, attended to him in sickness and in health, and saw to it that he had every care and attention necessary to his comfort and happiness. That he tilled his land and gathered his crops, did his errands and took care of his home, looked after his business affairs when so directed, and performed any and all duties to fully and completely comply with the contract he had entered into with the said O. L. Landmon, deceased. . . Petitioner further shows that pursuant to the contract and agreement with O. L. Landmon, deceased, mentioned and described above, he saw to it that he was decently buried and his grave properly marked. That, in so far as his knowledge goes, all of deceased's debts have been paid, including

Pleading, 31 Cyc. p. 523, n. 46.
Specific Performances, 36 Cyc. p. 784, n. 15 New; p. 785, n. 17. ·

the funeral expenses and the marking of his grave. That, if this has not been done, petitioner is willing that it should be done out of the money, property, and effects belonging to said O. L. Landmon at the time of his death." After the petition was filed, J. B. Mehaffey, G. W. Mehaffey, and O. W. Mehaffey were allowed without objection to file an intervention which alleged the following: "That they are the brothers of J. F. Mehaffey, the original plaintiff in the above-stated case, and that the contract mentioned and described in his petition was made by the said O. L. Landmon, but that your intervenors were parties to said contract, and that the same was made with your intervenors and the said J. F. Mehaffey jointly, and was accepted and performed by each and all of them, including the said J. F. Mehaffey. That while the said J. F. Mehaffey performed the greater portion of the services mentioned in said petition, necessary to a compliance with said contract, said services were performed for and on behalf of your intervenors and the said J. F. Mehaffey jointly, and they and each of them are jointly interested with the said J. F. Mehaffey in said contract. . . They and each of them adopt as their own each and all the allegations made in said petition and each and every prayer therein made. . . They further show that the said J. F. Mehaffey is willing and consents to their intervention in said suit, and agrees for them to become joint parties plaintiff with him in said suit."

The defendant's answer denied the allegations of the petition, in so far as they set out or purported to set out a contract with the decedent. On the trial there was considerable evidence to the effect that before the death of O. L. Landmon he made statements to different witnesses that he desired and intended to leave his property to his nephews, meaning the original petitioner and the intervenors, in consideration of their attentions and care for him, and that the nephews rendered services of that kind. In regard to a contract and performance thereof, the sister of the petitioner and the intervenors testified as follows: "I am a sister to the Mehaffey boys. I was related to O. L. Landmon. I live in Campbell County now. I knew Uncle Lem in his lifetime. He died in 1923. I remember seven or eight years ago when he had a spell of pneumonia. At that time we were living on the Felton place in Campbell County, about 15 miles from where Uncle Lem lived

in Douglas County, across the river. Fulton went and waited on him during the time he had that pneumonia. When he got up from pneumonia he came home with Fulton and stayed two days. On that occasion he told the boys for one of them to come and stay with him, all he had was theirs, to bury him and give him a decent funeral when he died, and all he [had] was theirs. We talked about him coming and living with us, but he said he would rather stay at home, he would live longer if he stayed at home, and he wouldn't go home satisfied without Fulton went with him. That was about three years before his death. It was in 1915, August, and he died in August, 1923. Fulton went home with him on that occasion and lived with him then until he died, at his home place. The other boys lived in Campbell County with me. Fulton always made Uncle Lem's home his home from that time until he died. Uncle Lem never visited us any more after that. I heard him say something about making a will on that occasion, and also heard him say something about twenty years ago. At that time he told them to get Mr. Baggett and three more men and let him make a will and give his property to my brothers. I have heard him talk about a will several times, before 1915. I never did see him any more after 1915. He always said he was going to will his property to my brothers. In 1915 he said he was going to will it to them provided Fulton went and stayed with him, and Fulton went. . . When Uncle Lem was talking about what he was going to do, Mr. Croker and his son were present there in the yard. I don't know what part of the yard. I was in the house. . . Nobody was present but Mr. Croker and his son. What he said was, for them to come over there and take care of him and he would give them all he had. You say you thought I said a while ago that he told Fulton that and made the trade with Fulton. He said for one of them to come, and whenever he died all he had would belong to them. Fulton was the one that went. . . The old man said he would give them all he had if they would go and take care of him, would make a will; but he neglected it. I reckon he didn't think maybe it was time for him to make it then. Away back before that he was going to make a will and wanted us to send for some folks, but we wouldn't do it."

A. J. Croker testified: "He said as long as the boys seen after

him, what he had was theirs and he intended for them to have it. That was during the time he was visiting there just after he had gotten up from the pneumonia. . . I think it was 1916 that I heard the old man talking about this matter, August or September or somewhere along there. I think the old man stayed there two or three days on that occasion. I was on the front veranda at the time he did this talking. Nobody was present then but me and Uncle Lem. Some of them was in the house, but I don't think anybody was out there but me and him when he told me that. That was the only time I ever heard him mention it. What he said was that as long as the boys seen after him, he intended to give it to them. The sister was in the house somewhere, I suppose. I didn't see her."

W. G. Croker testified: "I remember about 1915 when the old gentleman had an attack of pneumonia. I had a talk with him about that time; we talked just like brothers, you know, and I says, 'Uncle Lem, you are over there by yourself; it is not very thickly settled in that part of the country, and you could get a good home with these boys; why don't you come and live with them?' He says, 'Well they treat me right and all, but you see I would rather be at the old home place; I have been there so long,' and he says, 'I want to get one of them to go there and live with me.' He never said which one; he said it would suit him better to be at home. He said he was going to give the boys what he had anyway; that was his intention; he says, 'Seems like they are going to take care of me, they have been doing it,' looking after him, going to see him. . . I talked with him twice about what he was going to do with his property, right there at John Mehaffey's, in the porch. I don't know that there was anybody present only home folks, Gus and John and Walt. They were around there, I don't know whether they were right present or not. We were sitting on the porch. I went purposely to see the man. I think both the conversations I had were on the veranda. I don't think I swore on the former trial that I was at the barn catching a mule or something when we had the conversation. When we had the second conversation I guess they was all there at the house. The first conversation we had was in '13, before he had the spell of sickness. At that time he said he aimed for the boys to have what he had. I don't know whether Miss Mehaffey was present at

that time or not. The second conversation was pretty much the same thing. I couldn't be sure just where the second conversation took place or who was present."

J. O. Lee testified: "I had a conversation with Mr. Landmon about what he expected to do with his property; that was in August, 1923, at the bridge near Uncle Lem's house. He come out there where I was at work on the bridge, and I says, 'How are you getting along?' 'Well,' he says, 'poorly, poorly,' I says, 'Well, you look poorly, Uncle Lem.' He says, 'Yes, I am hardly able to get out.' I says, 'It is time you was making your will to somebody.' He says, 'No sir, it ain't.' I says 'Why not?' He says 'I have done give my stuff, my property, to the boys,' meaning the Mehaffey boys. That was about a week before he died."

The court charged the jury on the theory that. the suit was a joint action by the several Mehaffey brothers, based on a joint contract. A verdict was returned: "We the jury find the issue in favor of the plaintiff." This verdict was construed by the court in connection with the pleadings as a verdict for the original petitioner and the intervenors jointly, and a decree in accordance with such construction was rendered. The defendant made a motion for a new trial, solely on the grounds that the verdict is contrary to evidence and without evidence to support it, decidedly and strongly against the weight of evidence, and contrary to law and the principles of justice and equity. The motion was overruled, and the movant excepted.

*C. B. McGarity* and *J. R. Hutcheson,* for plaintiff in error.

*H. A. Allen* and *Astor Merritt,* contra.

ATKINSON, J. This verdict should be set aside on the ground that it is not supported by the evidence in the case. The only contract declared upon in the original petition is set forth in the statement of facts, and purports to be a contract between the petitioner, J. F. Mehaffey, and O. L. Landmon, the decedent, which contemplated personal services by the former to the latter. It is unequivocally an allegation of an agreement upon the part of O. L. Landmon to leave by will all of his property to J. F. Mehaffey, the original plaintiff. The other parties plaintiff intervened, and ordinarily intervenors as parties plaintiff take the case as they find it. They did not offer to strike any portion of the petition, but in their intervention expressly adopted every allegation in the

original petition. That is capable of but one construction, which is that a contract was made by the decedent to leave his property to J. F. Mehaffey. The intervenors do make allegations that they were parties to that contract and were to share in the consideration thereof, but they do not deny that the contract as set out in the original petition was the contract made. If they had desired to do this they should have brought an independent suit setting up a joint contract. The allegations in the intervention of a joint contract would not be taking the case as the intervenors found it. While the allegations of a joint contract as contained in the intervention when considered alone would be repugnant to the allegations in the original petition of a separate contract, they are not to be so construed when considered in connection with other language in the intervention expressly ratifying all the allegations contained in the original petition. The intervenors could not in the same breath say that the contract was a separate contract and also that it was a joint contract, and the intervention construed most strongly against the intervenors must be construed as adhering to the allegations contained in the original petition to the effect that the contract was the individual contract of J. F. Mehaffey. Under such construction it would require proof of an individual contract as alleged in the individual petition, to support a recovery. An allegation of a contract with J. F. Mehaffey can not be proved by evidence of a contract with J. F. Mehaffey and others jointly. *Glausier* v. *Boston Naval Stores Co.*, 132 *Ga.* 549 (64 S. E. 547). The evidence did not establish the individual contract alleged in the original petition, and the verdict should be set aside as being without evidence to support it.

*Judgment reversed. All the Justices concur.*